In re Appeal of INFOTECHNOLOGY,
INC., Shareholder Litigation
Disqualification of Counsel.

Supreme Court of Delaware.

Submitted: Oct. 3, 1990.
Decided: Oct. 31, 1990.

Steven J. Rothschild (argued), Anthony W. Clark, Robert A. Glen and Karen L. Valihura of Skadden, Arps, Slate, Meagher & Flom, Wilmington,

Theisen, Lank, Mulford & Goldberg, P.A., Wilmington, Fried, Frank, Harris, Shriver & Jacobson, New York City, Jenner & Block, Chicago, Ill., Latham & Watkins, Shearman & Sterling and Weil, Gotshal & Manges, New York City, amicus curiae on behalf of Skadden, Arps, Slate, Meagher & Flom.

Grover C. Brown, amicus curiae appointed by the Court, of Morris, James, Hitchens & Williams, Wilmington.

Before HORSEY, MOORE and WALSH, JJ.

MOORE, Justice.

This interlocutory appeal by the law firm of Skadden, Arps, Slate, Meagher & Flom challenges an order of the Court of Chancery disqualifying that firm from representing the plaintiff, Avacus Partners, L.P. (Avacus), in this case because the defendants, directors of Infotechnology, Inc. (Infotech), had retained an investment banker, Prudential–Bache Securities, Inc. (Prudential–Bache), whom Skadden had previously represented in wholly unrelated matters. Prudential–Bache is not a party here. Relying solely upon the Delaware Rules of Professional Conduct (the Rules), the trial court held that opposing counsel, and not their clients, had an independent right to challenge Skadden's representation of Avacus. Finding a technical violation of the Rules, but no threat to the fairness of the proceedings, the Court of Chancery ordered Skadden's disqualification.

While we recognize and confirm a trial court's power to ensure the orderly and fair administration of justice in matters before it, including the conduct of counsel, the Rules may not be applied in extra-disciplinary proceedings solely to vindicate the legal profession's concerns in such affairs. Unless the challenged conduct prejudices the fairness of the proceedings, such that it adversely affects the fair and efficient administration of justice, only

this Court has the power and responsibility to govern the Bar, and in pursuance of that authority to enforce the Rules for disciplinary purposes.

On this record Skadden's prior representation did not as an issue of law implicate enforcement of the Rules by the Court of Chancery. Under the circumstances that court lacked jurisdiction to entertain the matter. Accordingly, the judgment of disqualification is reversed.

## I.

The present dispute arises out of a battle for control of Infotech. Between April, 1988, and August, 1989, Avacus acquired a significant block of Infotech stock and publicly disclosed that it might attempt to gain control of the entire company. Infotech adopted several defensive measures to thwart Avacus. Among the devices employed was a stock swap of about 1.5 million Infotech shares for all of the stock of WNW Group, Inc. In the course of that transaction Prudential–Bache issued an opinion, upon which Infotech's directors had apparently relied, that the exchange was fair to the Infotech stockholders. The suit filed by Avacus challenged the fairness of the merger between Infotech and WNW, Inc., a company in which Infotech's directors allegedly had a personal interest.

Skadden had never represented either Infotech or WNW Group. However, Prudential–Bache, who is not a party, had earlier been advised by Skadden in connection with the drafting and issuance of Prudential's fairness opinions in at least two other wholly unrelated matters. This advice had included the methodology and composition of those opinions. Skadden also advised Prudential–Bache on the potential liability involved in issuing fairness opinions.

Several weeks before Infotech moved to disqualify Skadden, John E. Welsh, III, a Director of Prudential–Bache's Mergers and Acquisitions Group and John Frary, a senior member of Prudential–Bache's legal department, independently spoke with two Skadden partners, Peter A. Atkins and William P. Frank. Welsh told Atkins that Prudential–Bache was "uncomfortable" with Skadden's representation of Avacus and that he was "concerned" that Prudential–Bache's fairness opinion might be challenged in the litigation. After an internal review, Atkins advised Welsh that Skadden did not "foresee a problem" with its representation of Avacus. The lawsuit did not challenge the Prudential–Bache opinion, but "only the information" that Infotech had supplied to Prudential–Bache and on which it relied in reaching its conclusions. Frank contacted Frary and similarly told him that after an internal review, Skadden believed there was no conflict in Skadden representing Avacus. After these discussions, neither Welsh nor Frary "insisted" that Skadden withdraw from the case. However, Welsh's expectation was that if a conflict arose, Skadden would withdraw.

More than two months after Avacus had filed suit and after the court had granted Avacus limited discovery, which Infotech opposed, Infotech and its directors moved to disqualify Skadden from further representation of Avacus. Significantly, Prudential–Bache did not join in that motion or file any document objecting to Skadden's representation.

Following discovery, on disqualification alone, briefing and argument, the Court of Chancery ruled that neither Infotech nor its directors had standing to challenge Skadden's representation since Skadden had not previously represented any of those parties. Thus, there was no conflict between them and Skadden. However, the court ruled that opposing counsel had standing to enforce the Rules of Professional Conduct, and that Skadden had breached its duty of loyalty to Prudential–Bache under Delaware Rule of Professional Conduct 1.7(a) by representing Avacus. The court directed Skadden to withdraw from the case. Skadden then filed a motion for reargument on behalf of Avacus. Avacus, however, retained new counsel and Skadden withdrew Avacus' motion, but subsequently filed a motion for reargument on its own behalf. The Chancellor denied the motion, and certified Skadden's interlocutory appeal to this Court. In granting certification, the Chancellor sug-

gested that his ruling determined a substantial question and established a legal right with respect to Skadden's ability to represent Avacus. Upon accepting this appeal we observed that the Chancellor's ruling also appeared to involve a question of law of first instance in this State, and that considerations of justice compelled us to afford Skadden an opportunity for review. *See* Supr.Ct.R. 41(b)(i) & 42(b)(v). *Cf. Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1275 (7th Cir.1983) (Coffey, J., dissenting) (noting counsel's independent due process right to review of disqualification ruling). Most importantly, however, the Chancellor determined that Skadden had violated one of the Rules of Professional Conduct. Although other Delaware state courts have authority to control the conduct of those who appear before them, *see State v. Wilson,* Del.Supr., 545 A.2d 1178, 1183 (1988), this Court, alone, has sole responsibility for admissions to the Bar and enforcing the Rules of Professional Conduct. *See In re Nenno,* Del.Supr., 472 A.2d 815, 819 (1983); *In re Green,* Del.Supr., 464 A.2d 881, 885 (1983); 10 *Del.C.* § 1906.

■ We recognize that in light of Avacus' election not to appeal Skadden's disqualification and its decision to hire new counsel, significant questions of standing and mootness may rise in this case. *See Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 434–35, 105 S.Ct. 2757, 2762–63, 86 L.Ed.2d 340 (1985); *Kirkland v. Nat'l Mortgage Network, Inc.,* 884 F.2d 1367, 1370 & 1370 n. 5 (11th Cir.1989); *Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d 1193, 1200 n. 14 (11th Cir.1985); *Analytica,* 708 F.2d at 1266; *Analytica,* 708 F.2d at 1275 (Coffey, J., dissenting). However, given the seriousness of the issues and the fact that Skadden had no other effective means of having such issues reviewed, the interests of justice required the acceptance of this appeal. Moreover, despite the prospect of mootness, this Court has recognized an exception to the general rule of declining to decide moot issues. Here, the question is one of public importance respecting governance of the Bar and its impact on the law and legal profession is real. Under such circumstances, and considering the state in which the law otherwise would be left if the appeal were refused, we were compelled to accept it. *McDermott, Inc. v. Lewis,* Del.Supr., 531 A.2d 206, 211–12 (1987). *See In re Appeal of Infotechnology, Inc. Shareholder Litigation,* Del.Supr., No. 113, 1990, Moore, J. (May 9, 1990) (ORDER).[1]

## II.

■ The questions whether a non-client litigant (one who has not previously been represented by opposing counsel) and also whether its lawyers have standing to enforce the Delaware Rules of Professional Conduct in a non-disciplinary proceeding are matters of first impression before us. They involve issues of law requiring a *de novo* review of the trial court's opinions. *See Fiduciary Trust Co. v. Fiduciary Trust Co.,* Del.Supr., 445 A.2d 927, 936 (1982). Normally, in exercising our sole and exclusive jurisdiction over matters affecting governance of the Bar, our review is *de novo* when addressing legal issues of the type raised here. *See In re Berl,* Del. Supr., 540 A.2d 410, 413 (1988); *In re Green,* Del.Supr., 464 A.2d 881, 885 (1983).

Skadden, Arps does not question the Court of Chancery's ruling that neither Infotech nor its directors had standing to challenge Skadden's prior representation of Prudential–Bache in unrelated transac-

---

1. Here, also, we cannot overlook a matter of considerable irony. Counsel for Infotech and its directors argued vigorously below that they had an independent right and duty under the Rules of Professional Conduct to vindicate the legal profession's concerns about this alleged conflict of interest. However, having successfully convinced the Chancellor of this seemingly high minded view, once Skadden's disqualification was an accomplished fact the same counsel advised both the Chancellor and this Court that they had no further interest in the matter. Indeed, they took no further part at all. Thus, it was necessary for us to appoint an *amicus curiae* to present an independent position. The Court expresses its special appreciation to Grover C. Brown, Esquire, a former Chancellor, for his substantial assistance which was provided without compensation.

tions. However, Skadden urges us to adopt a bright-line rule that would prohibit any motion for disqualification other than that filed by a former client. The Court's amicus, former Chancellor Brown, agreed that while the Court of Chancery appropriately denied standing to Infotech and its directors, this Court should not adopt Skadden's proposed bright-line test. The amicus argued that the Rules of Professional Conduct permit a non-client litigant to raise the conflict issue in certain limited circumstances where the conflict interferes with *the litigant's* right to a fair judicial proceeding. However, no such issue is raised here, as the trial court properly found.

The Chancellor ruled that counsel have standing to seek their opponent's disqualification under Rule 1.7. The court reasoned that Rule 1.7 was designed to protect both clients and *the profession* and therefore a lawyer had an ethical obligation under Rule 8.3 to report and enforce any violation of the ethical code. *See Avacus Partners, L.P. v. Brian*, Del.Ch., Civ. A. No. 11001, Allen, C., slip op. at 13, 15–16, 1990 WL 6576 (Jan. 23, 1990). In a subsequent opinion, the Chancellor held that the standing issue was not dispositive of the outcome of the matter. *See Avacus Partners, L.P. v. Brian*, Del.Ch., Civ. A. No. 11001, Allen, C., slip op. at 9–10, 1990 WL 27538 (Mar. 9, 1990). The Chancellor reasoned that a court would be less likely to disqualify counsel on the conflict issue, especially in expedited matters, when disqualification would have a greater negative impact on the party to the litigation than the non-party. *Id.*

Skadden, and the Court's amicus, challenged this aspect of the Chancellor's ruling. They argued that as a general rule, courts refuse to decide such claims under the Rules of Professional Conduct. In fact, both cite a multitude of cases denying third party standing in ethical conflict disputes upon the basic policy, expressed in the Scope of the Delaware Rules of Professional Conduct, that it is impermissible to allow surrogates to enforce the profession-

al obligations of lawyers for tactical advantage at trial. *See In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 87 (5th Cir.1976).[2]

The Court's amicus, however, expressed the best rationale for deciding the matter. Simply put, the Scope of the Rules, and Rule 1.7 itself, do not contemplate a non-client third party's enforcement of conflict matters. The only exception being when that party proves a personal detriment or misconduct which taints the fairness of the proceeding. The Court's amicus argued that lawyers ordinarily have no independent standing in extra-disciplinary proceedings to challenge ethical violations through their membership in the Bar.

The amicus correctly observed that none of the cases cited by the trial court hold that a lawyer has the power, independently of his or her client, to object to the opposing counsel's alleged conflict. The amicus also contended that Rule 8.3 does not vest lawyers with the authority to bring ethical violations to the attention of the trial court for the purpose of having that court discipline counsel under the Rules. Rule 8.3 effectively replaced DR1–103(A) which required a lawyer to report unprivileged knowledge of ethical violations to *"a tribunal"* or *"other authority"* (emphasis added). The new rule requires lawyers to report only violations raising "substantial" questions about a lawyer's "honesty, trustworthiness or fitness." Del.R.Prof.C. 8.3 comment. Furthermore Rule 8.3 only requires the lawyer to report violations to "the appropriate professional authority" and not to a tribunal. Del.R.Prof.C. 8.3.

### III.

The Rules prohibit the representation of a litigant when another client is adversely affected. Subsection (a) of Rule 1.7 provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

---

**2.** All the parties also distinguished the cases cited in the Chancery opinions, which allegedly supported standing for lawyers to challenge opposing counsel's representation on conflict grounds.

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

The comments to Rule 1.7 explicitly state that the essential purpose of the rule is to ensure a lawyer's duty of loyalty to the client. *See* Del.R.Prof.C. 1.7 comment. Indeed, this Court has so held. *Schell v. Stryzs,* Del.Supr., No. 444, 1988, Walsh, J., slip op. at 3 (Apr. 24, 1989) [561 A.2d 467 (table)] (ORDER). In *Schell* the Court concluded that a father did not have standing to enforce a claim that a lawyer breached Rule 1.7 by representing both a mother and her son in a visitation proceeding. The Court specifically observed that the father was simply "not claiming a breach of the loyalty to himself as a client." *Id.*

The Scope of the Rules articulate certain valid policy reasons why a non-client litigant lacks standing to enforce an alleged conflict between his opponent's counsel and a third party:

> Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rules. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.

Del.R.Prof.C.Scope.

Thus, it is clear that even though lawyers have substantive legal duties, which may be congruent with the requirements and objectives of the Rules, the latter provide no additional bases for the enforcement of such duties outside of the framework of disciplinary proceedings. The reasons for this, however, are not limited to the Scope. In Delaware there is the fundamental constitutional principle that this Court, alone, has sole and exclusive responsibility over all matters affecting governance of the Bar. *In re Nenno,* Del. Supr., 472 A.2d 815, 819 (1983); *In re Green,* Del.Supr., 464 A.2d 881, 885 (1983). This is of such historic and constitutional proportions as to be "too well established ... to admit of argument." *Delaware Optometric Corporation v. Sherwood,* Del. Supr., 128 A.2d 812, 816 (1957). As this Court has previously stated, the General Assembly's adoption of 10 *Del.C.* § 1906, providing for a competent number of persons to be admitted to the Bar by the Supreme Court, and be subject to such disciplinary measures as the Supreme Court in its discretion may determine, is merely declaratory of the ancient rule, transplanted to Delaware by the English colonists, that this Court, alone, may establish and govern the Bar. *Id. In re Nenno,* 472 A.2d at 819. Similarly, 10 *Del.C.* § 1907, defining the oath of office of a member of the Bar, is reflective of this same immutable principle. *See also* Supr. Ct.R. 54.

Returning to the limitation found in the Scope, its strictures are both fair and practical. The Rules are to be enforced by a disciplinary agency, and are not to be subverted as procedural weapons. Other courts have recognized the potential for such abuse. *See Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 436 105 S.Ct. 2757, 2763–64, 86 L.Ed.2d 340 (1985); *Bd. of Ed. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1979); *Satellite Financial Planning Corp. v. First Nat'l Bank,* 652 F.Supp. 1281, 1283 (D.Del.1987).

Both Skadden and the Court's amicus argued that the possibility of using disqualification motions as a trial tactic was espe-

cially relevant in Delaware because of the unusually large number of complex corporate cases heard here. Skadden noted that many of the recent large corporate cases, including *Paramount Communications, Inc. v. Time, Inc.,* Del.Supr., 571 A.2d 1140 (1990), and *Mills Acquisition v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261 (1989), would have been susceptible to disqualification motions if the trial court's decision was the applicable rule of law at that time.

## IV.

We agree that Infotech did not have standing to challenge Skadden's alleged conflict with Avacus and Prudential–Bache. Infotech cannot enforce an alleged technical violation of the Rules especially where it has become apparent that it was seeking to use disqualification as a litigation tactic. The Court's amicus, however, cautioned that we not adopt the bright line rule advocated by Skadden.

■ The amicus' position is well supported by the Rules. The Comment to Rule 1.7 states that although lawyers are usually responsible for resolving conflict issues, "opposing counsel may properly raise the question" when the alleged conflict clearly calls into question "the fair or efficient administration of justice...." The Comment further advises that such objections should be viewed cautiously because of the potential tactical abuses articulated in the Scope of the Rules. Simply, a non-client litigant has standing to enforce Rule 1.7(a) when he or she can demonstrate that the opposing counsel's conflict somehow prejudiced *his* or *her* rights. The non-client litigant does not have standing to merely enforce a technical violation of the Rules. We agree with these principles and have previously adopted them by virtue of our promulgation of the Rules in 1985. *See* 16 Del.Code Ann. 618–79.

■ Recognizing the potential abuses of the Rules in litigation, we conclude that the burden of proof must be on the non-client litigant to prove by clear and convinc-

ing evidence (1) the existence of a conflict and (2) to demonstrate how the conflict will prejudice the fairness of the proceedings. *See, e.g.,* R.Bd.Prof.R.Del.Supr. 15(c). Infotech and its directors totally failed to sustain that burden in the Court of Chancery.

■ The Court's amicus also suggests, and we agree, that Chancery Rule 11, which prevents Delaware lawyers from filing vexatious or meritless claims, would effectively prevent parties from abusing the Rules for their own tactical advantage.[3] If the trial court finds that the party's claim is indeed meritless, it can invoke the appropriate sanctions.

Thus, we do not adopt a "bright-line" test denying standing to all non-client litigants to challenge misconduct that taints the fairness of judicial proceedings. The Rules contemplate that a non-client may seek to enforce Rule 1.7 when the conflict adversely affects his or her rights. We therefore place the burden on the non-client litigant to prove the existence of a conflict and to show by clear and convincing evidence exactly how that conflict will affect the "fair and efficient administration of justice." Any abuses for mere tactical gain should, and must, be addressed by the trial court. It has full power to employ the substantive and procedural remedies available to properly control the parties and counsel before it, and to ensure the fairness of the proceedings. *See Bd. of Ed. v. Nyquist,* 590 F.2d 1241, 1245–46 (2d Cir. 1979).

■ Absent misconduct which taints the proceeding, thereby obstructing the orderly administration of justice, there is no independent right of counsel to challenge another lawyer's alleged breach of the Rules outside of a disciplinary proceeding. Likewise, the trial courts have no jurisdiction to entertain such applications except as noted above. Nonetheless, trial courts retain their traditional powers, which are indeed potent, to address, rectify and punish conduct of a party or counsel which

---

**3.** The Rules of the Court of Chancery are modeled upon and generally follow the relevant Federal Rules of Civil Procedure. Thus, Chancery Rule 11 is similar to FRCP 11.

threatens the legitimacy of judicial proceedings. Nothing we say here is intended to limit or circumscribe such authority.

The judgment is REVERSED.